**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| MARIA SANTANA-CONCEPCION, et al.<br><br>   Plaintiffs,<br><br>v.<br><br>CENTRO MEDICO DEL TURABO, et al.<br><br>   Defendants. | **Civil No. 08-1262 (SEC)** |

**OPINION AND ORDER**

Before the Court are co-defendant Centro Medico del Turabo, Inc.'s motion for partial summary judgment (Docket # 121) and plaintiffs' opposition thereto (Dockets # 128 and 131). After reviewing the filings and the applicable law, defendants' motion is **GRANTED**.

**Factual and Procedural Background**

This is a medical malpractice diversity suit that arises out of a brain surgery performed on co-plaintiff Maria Santana-Concepcion. Her four offsprings (only two of legal age when the suit commenced) joined as co-plaintiffs (together with Santana-Concepcion, "Plaintiffs").[1] Defendants are the surgeon who performed the surgery, Dr. Julio Rosado, and the hospital where it was performed, Centro Medico del Turabo, Inc. (the "Hospital" and together with Dr. Rosado, "Defendants"). The material, uncontested facts brought forth before the Court follow.[2]

In August 2006, Santana-Concepcion, an experienced registered nurse, was diagnosed

---

[1] Santana-Concepcion's husband had also joined as a plaintiff, but he passed away while the suit was pending. Santana-Concepcion represents the heirs' interests in this case.

[2] Plaintiffs filed a 52-page long statement of contested facts, containing repetitive, unfounded objections based on the local anti-ferret rule as well as on excessive, unnecessary quotations from depositions and sworn statements. The recitation provided below encompasses only those undisputed facts the Court deemed supported by the evidence of record.

with an arachnoid cyst by her physicians in New York.[3] Months later, during a visit to Puerto Rico, Santana-Concepcion went to the Hospital's emergency room, with an intense headache and feeling "that [her] eyes were going to fall out of their socket." (Docket 128-3). She was admitted to the Hospital, and Dr. Rosado informed her that emergency surgery was necessary to treat a brain tumor.[4] He performed the surgery on November 17, 2006. And, at some point thereafter, Santana-Conception learned that the so-called tumor that Dr. Rosado had operated on was her cyst.

Back in New York, Santana-Concepcion, accompanied by a son who served as interpreter, visited her physician on January 2, 2007.[5] The physician produced the following treatment notes on that visit:

> This is a 46-year-old female with history of an arachnoid cyst, who comes in today in follow-up. She actually apparently had a VP shunt placed in Puerto Rico when she was seen in the ER the cyst was evaluated there. This was in mid-November. She states that she has no further depressive symptoms. She has however, had symptoms of decreased vision, difficulty with gait and balance and she has noted that her voice is much louder than previously and her sons need to have to point out to her that she is talking loudly.
>
> She has had no seizure activity. She was started on Dilatin at that point. *She did not bring her records today for me to look at.*
>
> . . . .

---

[3] An arachnoid cyst is a membrane-lined fluid sac, located between the lower brain and spinal cord region of the cranium. Stedman's Medical Dictionary 353 (5th ed. 1982).

[4] The parties' submissions at this stage contain scant details about the events leading up to the surgery and about the professional relationship between the Hospital and Dr. Rosado. Filling this void, however, is unnecessary to adjudicate the present motion.

[5] The record shows that Santana-Concepcion had difficulties with the English language and relied on her sons for assistance. In fact, treatment notes from a medical consultation conducted in July 9, 2008 stated as much: "She speaks some English but most of the history is provided through translation through her two sons who speak English fluently." Docket # 128-15; see also Docket # 121-5, p. 5; Docket # 128-12, p. 52:16-19. Santana-Concepcion's opposition memoranda confirms the point: "Ms. Santana cannot understand English." Docket # 128, ¶ 8.

> We will look at her records and then try to get her referred back to Dr. Maxwell for neurosurgery to follow the shunt as well as Dr. Honch. Will . . . come up with a treatment plan *after we see her records*.

Docket # 121-8 (emphasis added).[6]

On February 20, 2007, Santana-Concepcion was hospitalized at the Rochester General Hospital, with symptoms of headache, dizziness, and visual changes. There, she underwent a CT scan and an MRI of the brain, and both exams showed that she had a VP shunt within the arachnoid cyst. The medical record from the hospitalization also showed that Santana-Concepcion had a possible new cerebral lesion and that a neurologist had discussed the exam results with her.

Two days after her hospitalization, Santana-Concepcion had a follow-up consultation with her treating physician in New York. The doctor summarized that visit with these remarks:

> This is a 46-year-old female with history of arachnoid cyst, S/P VP shunt placement in Puerto Rico who comes in today in follow-up from a hospital stay. She had what appears to be as a final diagnosis benign positional vertigo. *However, she did see a neurologist in consult who recommended that she might consider getting the shunt taken out as it is not decreasing the size of the cyst and has seemed to result in some behavior changes.*
>
> *She also complains of intermittent pain at the shunt site behind the left ear.*

Docket # 121-9 (emphasis added).

This suit followed on March 3, 2008, a bit over a year after Santana-Concepcion's hospitalization in New York. Docket # 1. In their complaint, Plaintiffs claim that Dr. Rosado failed to obtain Santana-Concepcion's informed consent for the surgery as well as to abide by the prevailing medical standard applicable to the treatment he provided. On this latter point, they specifically argue that the surgical intervention was contraindicated for Santana-

---

[6] A VP shunt "is a device which drains the extra fluid in the brain into the peritoneal cavity where the fluid can be absorbed." http://neuroanimations.com/Hydrocephalus/Shunts/VP_Shunt.html (last visited on March 21, 2012).

Concepcion's condition. Plaintiffs also take issue with the surgery results: "To this day, the referred to brain tumor is intact. The surgical intervention was a fiasco. The supposed tube [which] was to drain the brain tumor . . . never was connected to the tumor." Docket # 53, ¶ 18. As to the Hospital, Plaintiffs contend that it is either vicariously liable for Dr. Rosado's negligence or directly liable for negligently failing to supervise him.

The Hospital eventually moved for partial summary judgment.[7] It argues that Santana-Concepcion's claims and those of the other legal age plaintiffs are time barred. As to the claims of the underage plaintiffs, the Hospital relies on remarks from Plaintiffs' expert to argue that Santana-Concepcion received proper medical treatment.[8] To be exact, the Hospital underscores three different colloquies from the deposition of Plaintiffs' expert. In the first, the expert admits that the Hospital employees incurred in no deviations from the applicable medical standard:

> Q. Doctor, in none of your reports do you make any allegations of deviations from the standards regarding employees of [the Hospital]; is that correct?
>
> A. I don't stay so specifically in my report.
>
> Q. So the only deviations that are included in your reports are regarding Dr. Rosado; is that correct?
>
> A. I state with regard to Dr. Rosado, but I guess it's up to the Puerto Rican law whether the [H]ospital is involved as well.

---

[7] In its submission, the Hospital did not contest those claims of Santana-Concepcion's underage children premised on the informed consent doctrine. Dr. Rosado neither joined nor filed a motion of his own.

[8] "In Puerto Rico, statutes of limitations do not run against minors until they reach the legal age of 21." Ocasio-Berios v. Bristol Myers Squibb Caribbean Corp., 73 F.Supp.2d 171, 174 (D.P.R. 1999) (citing applicable Puerto Rico law). In the section entitled "Applicable Law and Analysis," the Court will address the Hospital's statute of limitations challenge first, and then, the underage plaintiffs' claims.

> Q. Anyway, that would be a legal question - -
>
> A. Yes.
>
> Q. - - if the [H]ospital is liable due to Dr. Rosado's deviation?
>
> A. Yes.
>
> Q. But you don't have any additional allegations or deviations from the nurses or from any other person; is that correct?
>
> A. Correct.

Docket # 121-10, 126:21-127:21.

In the second colloquy, the expert concedes that the treatment afforded to Santana-Concepcion comported with that accepted by medical authorities:

> Q. Doctor, would you agree with the following: Controversy surrounds the treatment of arachnoid cysts?
>
> A. Yes.
>
> Q. Some clinicians advocate treating only patients with symptomatic cysts whereas others believe that even asymptomatic cyst should be decompressed to avoid future complications?
>
> A. I would - - my opinion is that doctors that recommend asymptomatic - - treatment of asymptomatic cysts are not in the majority, they are probably in the minority.
>
> Q. But there are some authorities that state that also?
>
> A. In my opinion, those authorities are not reasonable or credible.
>
> Q. But those authorities or school of thought exist?
>
> A. Yes.
>
> Q. And you don't agree with that, but others don't agree with you; is that correct?
>
> A. I guess so; yes.

6

Docket # 121-11, 140:11-141:11.[9]

Lastly, in the third colloquy, the expert states that Dr. Rosado employed a proper technique to perform the surgery:

> Q. - - whether [the surgery was] indicated or not, the technique used, I mean by that the surgical approach, the surgical technique, the events that occurred within the operating room, those issues, as far as you're concerned, are not issues of negligence in this case?
> A. Not that I can tell; no.
> Q. So as far as you're concerned, that course of action, again, assuming that it was indicated, that course of action was correct?
> A. Yes.

Docket # 121-12, 97:6-21.

Plaintiffs oppose each of the Hospital's contentions. Docket # 131-1. Regarding the statute of limitations challenge, Plaintiffs rely on deposition testimony and a sworn statement from Santana-Conception, asserting that they obtained the requisite knowledge to sue in March or April 2007, when first told that the VP shunt was out of place. Plaintiffs thus contend that the suit was timely filed on March 3, 2008.

Plaintiffs offer no evidence or argument to address the remarks the Hospital underscored from the expert's deposition. In fact, they failed to refute the Hospital's allegations regarding the lack of a vicarious liability claim against them. Similarly, Plaintiffs disregard the Hospital's contentions that (1) the treatment provided to Santana-Concepcion comported with that recommended by medical authorities; and (2) the technique Dr. Rosado

---

[9]Plaintiffs contend that Santana-Concepcion's cyst was asymptomatic. Evidence of record shows otherwise. Specifically, treatment notes from a neurologist in New York state that "while in Puerto Rico [Santana-Concepcion] underwent an attempted decompressive procedure for 'symptomatic left frontal arachnoid cyst.'" Docket # 128-15.

7

employed to perform the surgery was proper. Plaintiffs instead bet the house on the opinion of their expert that the surgical treatment of Santana-Concepcion's arachnoid cyst was contraindicated. Docket 131-1, ¶ 45, (citing the Court to Docket # 128, p. 34, ¶ 47).

**Standard of Review**

The Court may grant a motion for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ramirez Rodriguez v. Boehringer Ingelheim, 425 F.3d 67, 77 (1st Cir. 2005). In reaching such a determination, the Court may not weigh the evidence. See Casas Office Machs., Inc. v. Mita Copystar Am., Inc., 42 F.3d 668 (1st Cir. 1994). At this stage, the court examines the record in the "light most favorable to the nonmovant," and indulges all "reasonable inferences in that party's favor." Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994).

The summary judgment inquiry is grounded in the factual evidence available, since "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). Once the movant has averred that there is an absence of evidence to support the nonmoving party's case, the burden shifts to the nonmovant to establish the existence of at least one fact at issue that is both genuine and material. See Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (citations omitted). "A factual issue is 'genuine' if 'it may reasonably be resolved in favor of either party and, therefore, requires the finder of fact to make 'a choice between the parties' differing versions of the truth at trial.'" DePoutout v. Raffaelly, 424 F.3d 112, 117 (1st Cir. 2005) (quoting Garside, 895 F.2d at 48 (1st Cir. 1990)). A material fact, in turn, is one that may affect the outcome of the suit under the governing law. Morris v. Gov't Dev. Bank of P.R., 27 F.3d 746, 748 (1st Cir. 1994).

At any rate, to defeat summary judgment, the opposing party may not rest on conclusory allegations, improbable inferences, and unsupported speculation. See Hadfield v. McDonough, 407 F.3d 11, 15 (1st Cir. 2005) (citing Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)). Nor will "effusive rhetoric" and "optimistic surmise" suffice to establish a genuine issue of material fact. See Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997). Accordingly, once the party moving for summary judgment has established an absence of material facts in dispute, and that judgment is proper as a matter of law, the "party opposing summary judgment must present definite, competent evidence to rebut the motion." Méndez-Laboy v. Abbot Lab., 424 F.3d 35, 37 (1st Cir. 2005) (quoting Maldonado-Denis v. Castillo Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994)). "The non-movant must 'produce specific facts, in suitable evidentiary form' sufficient to limn a trial-worthy issue . . . . Failure to do so allows the summary judgment engine to operate at full throttle." Id.; see also Kelly v. United States, 924 F.2d 355, 358 (1st Cir. 1991) (warning that "the decision to sit idly by and allow the summary judgment proponent to configure the record is likely to prove fraught with consequence"); Medina-Muñoz, 896 F.2d at 8, quoting Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989) (holding that "[t]he evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a fact finder must resolve").

**Applicable Law and Analysis**

*The Hospital's Statute of Limitations Challenge*

Because this is a diversity case, the substantive law of Puerto Rico controls. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). Puerto Rico law affords one year to file suit for medical malpractice after "'the aggrieved person [has] knowledge thereof.'" P.R. Laws Ann. tit. 31, § 5298; see also Ortiz v. Municipio De Orocovis, 13 P.R. Offic. Trans 619, 113 P.R.

Dec. 484, 485 (1982). The statute of limitations does not wait for the injury to "reach its final degree of development," but it does not run until there is "knowledge" of the malpractice. Id. Such knowledge is not merely that of the injury, but also of the causal link between the injury and the occurrence of negligence. Guzman-Camacho v. State Ins. Fund Corp., 418 F. Supp. 2d 3, 9 (D.P.R. 2006); see also Rivera Encarnacion v. E.L.A., 13 P.R. Offic. Trans. 498, 113 P.R. Dec. 383, 386 (1982). Therefore, the statute of limitations for a malpractice suit starts running when the aggrieved learns about both his injury as well as the person who caused it. Torres v. E.I. Dupont de Nemours & Co., 219 F.3d 13, 18 (1st Cir. 2000) (citing Colon Prieto v. Geigel, 15 P.R. Offic. Trans. 313, 330, 115 P.R. Dec. 232, 246 (1984)).

The same standard applies to claims of relatives of someone aggrieved by a medical malpractice. In fact, Puerto Rico tort law "recognize[s] that a person is entitled to compensation for the sufferings, emotional distress or mental anguish experienced as a consequence of the material or other damages caused directly to their relatives." Santino-Rivera v. Serv Air, Inc., 1994 P.R.- Eng. 909, 527, 137 P.R. Dec. 1, 10-12 (1994). But the period available to exercise such action is one year. Id. And this period also begins to run when the plaintiff learns about the damages suffered by the relative victim of malpractice. Id.

The aforementioned legal principles suffice to rule upon the Hospital's statute of limitations challenge. As stated above, the parties are pitted against each other as to the exact date in which Santana-Concepcion acquired the requisite knowledge to file this suit—Plaintiffs contend that sometime in March or April of 2007, and the Hospital, that it was in January or February 2007. The undisputed evidence of record proves the Hospital right.

The Court's analysis begins with Santana-Concepcion and other legal age plaintiffs' lack of informed consent claims. It is well settled that a physician's failure to obtain the patient's informed consent for surgery gives rise to a cause of action. . . . separate and distinct

from a cause of action for medical malpractice attributable to a diagnosis or treatment." Santiago-Otero v. Mendez, 1994 P.R. - Eng. 909, 224, 135 P.R. Dec. 540, 557 (1994). The statute of limitations for this type of suit thus begins to run when the aggrieved learns that she was subjected to an unauthorized medical procedure. Villarini-Garcia v. Hospital Del Maestro, Inc., 8 F.3d 81, 85 (1st Cir. 1993). Here, among other things, Plaintiffs contend that Dr. Rosado never informed Santana-Concepcion that he intended to operate on her cyst. Thus, their lack of informed consent claim accrued when Santana-Concepcion learned the real object of the surgery. The record shows that she knew such fact more than a year before filing this suit.

For example, the treatment notes of Santana-Concepcion's January 2, 2007 consultation (these notes were developed without the medical records of the surgery, since Santana-Concepcion failed to bring them to the consultation) describe details about the surgery in Puerto Rico, including that a VP shunt had been placed within the cyst. The same can be distilled from the record of Santana-Concepcion's hospitalization on February 20, 2007, as well as the treatment notes from her follow-up consultation two days later—the presence of a VP shunt within her cyst was well documented in both instances. Furthermore, the notes from Santana-Concepcion's follow-up visit show that she discussed the VP shunt with the neurologist who tended to her while hospitalized.

Plaintiffs' submissions nowhere address this evidence. Instead, they contend that Santana-Concepcion first learned about a possible cause of action in March 2007, when told by a doctor in New York that the VP shunt was out of place. This argument misses the mark. Santana-Concepcion's lack of informed consent cause of action accrued when she learned that Dr. Rosado had operated on her cyst without her consent, not when she learned that the VP shunt was out of place. And, as discussed above, she learned the former before visiting her New York physician on January 2, 2007. Filed on March 3, 2008, the suit on this front

came at least two months late.[10]

The same holds true for the other malpractice claims of the legal age plaintiffs. As to these claims, the statutory clock began ticking with the onset of Santana-Concepcion's first negative post-operation symptoms. The undisputed evidence of record also marks January 2, 2007 as the day in which such symptoms were first documented. The treatment notes of that day, show that Santana-Concepcion told her physician that, after the surgery in Puerto Rico, she had developed symptoms of "decreased vision, difficulty with gait and balance and she ha[d] noted that her voice [was] much louder than previously and her sons need to have to point out to her that she [was] talking loudly." Docket # 121-8. Related adverse post-operation symptoms (including pain at the shunt site) were also documented during her hospitalization and follow-up visit of February 2007. In fact, the neurologist who examined Santana-Concepcion at the time specifically recommended to her "getting the shunt taken out as it [was] not decreasing the size of the cyst and ha[d] seemed to result in *some behavior changes.*" Docket # 121-9 (emphasis added). At this point in time, an experienced registered nurse herself, Santana-Concepcion had more than ample indications that the operation of her cyst may had gone awry. A similar logic applies to her legal age sons, who, as translators, facilitated their mother's interactions with the doctors in New York. For these reasons, all the claims of Santana-Concepcion and her legal age children are time barred. The Court thus **GRANTS** the Hospital's summary judgment motion as to these plaintiffs.

*The Challenge to the Claims of the Underage Plaintiffs*

As stated previously, the claims of the underage plaintiffs are immune from the Hospital's statute of limitations challenge. The Hospital nevertheless also attacks Plaintiffs'

---

[10] In the alternative, Plaintiffs contend that Dr. Rosado failed to inform Santana-Concepcion about the possible implications of the surgery. Under such scenario, a malpractice claim would accrue upon the onset of negative post-operation symptoms, which would alert a reasonable person about relevant information that may have not been disclosed. Villarini-Garcia, 8 F.3d at 85. The discussion that follows also forecloses this claim.

general malpractice claims, advancing evidence against the imposition of either vicarious or direct liability. Because Plaintiffs have failed to rebut the evidence advanced in connection with the lack of vicarious liability claims, the Court limits its inquiry to whether the Hospital responds directly for Dr. Rosado's acts. See Sagardia de Jesus v. Hosp. Aux. Mutuo, 177 P.R. Dec. 484, 513-14 (2009) (holding that when a patient goes directly to a hospital for medical treatment, and the hospital provides the physicians, the hospital and the physicians are jointly liable for any act of malpractice). This in turn requires an analysis under Puerto Rico's medical malpractice law.

A plaintiff must establish three elements to prevail in a medical malpractice claim filed in Puerto Rico: "(1) the basic norms of knowledge and medical care applicable to general practitioners or specialists; (2) proof that the medical personnel failed to follow these basic norms in the treatment of a patient; and (3) a causal relation between the act or the omission of the physician and the injury by the patient." Santiago v. Hospital Cayetano Coll y Toste, 260 F. Supp. 2d 273, 381 (D.P.R. 2003); see also Pagan Rivera v. Municipio de Vega Alta, 127 P.R. Dec. 538 (1990).The First Circuit has held that "[u]nder this framework, breach of duty is an essential element of a cause of action for malpractice . . . [and] [t]o consider whether a breach has been shown, we first must understand the nature of the duty owed." Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 6 (1st Cir. 2010). Thus the "burden of a medical malpractice plaintiff in establishing the physician's duty is more complicated than that of an ordinary tort plaintiff. Instead of simply appealing to the jury's view of what is reasonable under the circumstances, a medical malpractice plaintiff must establish the relevant national standard of care." Lama v. Borras, 16 F.3d 473, 478 (1st Cir. 1994).

"The general parameters of the duty of care that a physician owes to a patient under Puerto Rico law are uncontroversial. The physician must employ a level of care consistent with that set by the medical profession nationally." Borges, 605 F.3d at 7 (citing Cortes-

Irizarry v. Corp. Insular de Seguros, 928 F. Supp. 141, 190 (D.P.R. 1996)). In explaining the duty of care owed to patients, Puerto Rico courts have described it as that level of care which, recognizing the modern means of communication and education, meets the professional requirements generally acknowledged by the medical profession. Santiago, 260 F. Supp. 2d at 380 (citing Cortes-Irizarry, 928 F. Supp. at 144); see also Oliveros v. Abreu, 101 P.R. Dec. 209, 226 (1973). Physicians are "expected to possess, and use, that level of knowledge and skill prevalent in his or her specialty generally, not simply the knowledge and skill commonly displayed in the community or immediate geographic region where the treatment is administered." Santiago, 260 F. Supp. 2d at 381 (citing Rolon-Alvarado v. Municipality of San Juan, 1 F.3d 74, 77 (1st Cir. 1993)).

The law nonetheless "neither holds a doctor to a standard of perfection nor makes him an insurer of his patient's well-being." Cortes-Irizarry, 928 F. Supp. at 145. An "error of judgment regarding diagnosis or treatment does not lead to liability when expert opinion suggests that the physician's conduct fell within a range of acceptable alternatives." Lama, 16 F.3d at 478. Accordingly, the existence of diverging criteria among medical authorities as to which course of action should be taken under particular circumstances constitutes a valid and acceptable defense. Losada v. E.L.A., 16 P.R. Offic. Trans. 250, 116 P.R. Dec. 202, 217 (1985).

In this case, the Hospital highlights the concession made by Plaintiffs' expert—that the surgical treatment provided to Santana-Concepcion comported with that recommended by some medical authorities—to rebuff the malpractice imputations against Dr. Rosado. Plaintiffs provide no counter argument to oppose the Hospital's contention and instead retort by stating that their expert opined that the surgery was contraindicated. Plaintiffs' position, however, succumbs when measured up against Losada, 16 P.R. Offic. Trans. 250 (holding that existence of diverging criteria among medical authorities constitutes a valid defense). Moreover, in Puerto Rico, well-settled law establishes that it is "insufficient for a plaintiff

14

in a malpractice case merely to show that another doctor would have chosen to treat the patient in a manner different from the manner in which the attending physicians treated him." Rolon-Alvarado v. Municipality of San Juan, 1 F.3d 74, 78 (1st Cir. 1993). Therefore, the fact that Plaintiffs' expert would have treated Santana-Concepcion differently, without more, does not amount to medical malpractice on the part of Dr. Rosado. This is all the more so given the expert's admission that some medical authorities sanction the treatment Dr. Rosado provided in this case. See Cruz v. Centro Medico de P.R., 13 P.R. Offic. Trans. 931, 113 P.R. Dec. 719, 732 (1983) ("[A]n error of judgment regarding diagnosis or treatment constitutes a defense when medical authorities do not agree as to which is the most adequate diagnosis or treatment."). For these reasons, the Court finds that the undisputed evidence of record the Hospital has marshaled warrants the relief requested; the summary judgment motion as to the claims of Santana-Concepcion's underage children is therefore **GRANTED**.

_____

**Conclusion**

For the reasons stated above, the Hospital's partial summary judgment motion is **GRANTED**; all claims, except those based on lack of informed consent filed by the underage plaintiffs, are **DISMISSED with prejudice**. Regarding the remaining lack of informed consent claims, the Court is still uncertain whether a trial is warranted, given the apparent emergency in which Santana-Concepcion was surgically intervened. See Rodriguez-Crespo v. Hernandez, 21 P.R. Ofic. Trans. 638, 121 P.R. Dec. 639, 663 (1988) ("A patient's consent is an indispensable factor for surgery, save for recognized exceptions, such as emergencies or when it may be detrimental by reason of the psychological impact of the patient's apprehension."). Before proceeding forward, the parties are **ORDERED** to brief the issue whether the surgery Santana-Concepcion underwent falls under the exception to the informed consent doctrine just described. The parties shall direct the Court to undisputed evidence of record—for example, medical records stating whether the cyst was symptomatic or asymptomatic, CT scans or MRIs performed before the surgery evincing the condition of Santana-Concepcion's brain— as well as to the medical and legal authorities supporting their respective positions. Defendants' submissions are due by April 30, 2012, and Plaintiffs' reply, 30 days later. If necessary, the Court will set trial dates after ruling upon this issue.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 30th of March, 2012.

*s/Salvador E. Casellas*
SALVADOR E. CASELLAS
U.S. Senior District Judge