# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

MARIA SANTANA-CONCEPCION, et
al.

     Plaintiffs,

v.

CENTRO MEDICO DEL TURABO, et
al.

     Defendants.

Civil No. 08-1262 (SEC)

## OPINION AND ORDER

Before the Court are defendants' motion for summary judgment (Docket # 141) and plaintiffs' opposition thereto (Docket # 150). After reviewing the filings and the applicable law, defendants' motion is **GRANTED**.

### Factual and Procedural Background[1]

This is a medical malpractice diversity suit that arises out of a brain surgery performed on co-plaintiff Maria Santana-Concepcion. Her four offsprings (only two of legal age when the suit commenced) joined as co-plaintiffs. Defendants are the surgeon who performed the surgery, Dr. Julio Rosado, and the hospital where it was performed, Centro Medico del Turabo, Inc. (the "Hospital" and together with Dr. Rosado, "Defendants").

Previously, the Hospital moved for summary judgment on all claims, "except the ones for lack of informed consent of the [underage plaintiffs]." Docket  # 121, ¶ 3.[2] Plaintiffs

---

[1] A more detailed factual background for the present suit can be found at <u>Santana-Concepcion v. Centro Medico Del Turabo</u>, No. 08-1262, 2012 WL 1107663 (D.P.R. Mar. 30 2012), an unpublished opinion issued earlier in this case. Here, the Court assumes familiarity with the same.

[2] Plaintiffs claims, all actionable under P.R. Laws Ann. tit 31, § 5141, were predicated on two theories: (1) that Dr. Rosado had failed to obtain Santana-Concepcion's informed consent for the surgery; and (2) that Dr. Rosado had failed to abide by the prevailing medical standard applicable for the treatment provided. Docket # 71. Dr. Rosado neither joined the Hospital's

opposed. Docket # 128. The Court then took the submissions under advisement, ultimately concluding that Santana-Conception's claims and those of the other legal age plaintiffs were time barred. Santana-Concpcion, 2012 WL 1107663.[3] The Court also dismissed the underage plaintiffs' general malpractice claims, finding them unsupported by the undisputed record. Id.[4]

At the time, however, the Court remained uncertain about whether a trial was needed to adjudge the underage plaintiffs' lack of informed consent claims. Id., p. 15. Specifically, the Court fell that the apparent emergency circumstances under which Dr. Rosado performed the surgery could support application of the "emergency" exception to the informed consent doctrine. Id. The Court therefore ordered the parties to brief the issue and to include any "undisputed evidence of record—for example, medical records stating whether the cyst was symptomatic or asymptomatic, CT scans or MRIs performed before the surgery evincing the condition of Santana-Concepcion's brain—as well as to the medical and legal authorities supporting their respective positions." Id.

Unsurprisingly, the parties took opposite stands in their submissions in compliance.[5] On the one hand, Defendants argue that the emergency exception applies because Santana-Concepcion risked death or permanent brain damage without Dr. Rosado's surgical

_____

motion nor filed a motion of his own.

[3] Because "[i]n Puerto Rico, statutes of limitations do not run against minors until they reach the legal age of 21," Ocasio-Berios v. Bristol Myers Squibb Caribbean Corp., 73 F.Supp.2d 171, 174 (D.P.R. 1999), the underage plaintiffs' claims were immune to a statute of limitations challenge.

[4] Plaintiffs timely moved for reconsideration. Docket # 138. But because their motion merely restates arguments previously rejected, it is hereby **DENIED.** See National Metal Finishing Co., Inc., v. Barclays American/Commercial, Inc., 899 F.2d 119, 123 (1st Cir. 1990) (stating that reconsideration "is not intended to allow parties to rehash old arguments already considered and rejected by the trial court . . . .").

[5] This time around Dr. Rosado and the Hospital filed a joint submission. Docket # 150.

3

intervention. Docket # 141-17, pgs. 8-10.  In support, they point the Court to pre-surgery neuroimaging documentation showing that Santana-Concepcion had a large arachnoid cyst in her brain. Id.[6] They also underscore pre-surgery symptoms, treatments, and treatment results compatible with a prognosis of elevated intracraneal hypertension, as well as deposition testimony from plaintiffs' expert stating that intracraneal hypertension can result in death or in permanent brain damage if untreated. Id. (citing docket # 141-1:21-3:24). Emergency exception aside, Defendants alternatively argue that no liability should be imposed because Dr. Rosado "obtained a written informed consent from [Santana-Concepcion] prior to the surgery." Id., p. 10.[7]

Plaintiffs, on the other hand, argue that the fact that Dr. Rosado performed the surgery two days after telling Santana-Concepcion that it was needed debunks the allegation that an emergency existed. Docket # 150, ¶ 4. They also contend that Santana-Concepcion "was alert and conscious [during those two days, so] defendants could [have] obtain[ed] inform[ed] consent from her during that period of time." Id. To support this contention, plaintiffs proffer excerpts from the following testimony Santana-Concepcion provided during her deposition:

A.      When I went there I went there because I had this horrible headache, with my eyes wanting to pop out. So, walk in my shoes for a little while, you know, if he comes over and he says, "This is a life or death situation, if you do not get this operation you're dying," and he says this in front of all my family, because that is what he said. You know, are you going to say yes? Well, yes, of course I'm going to say yes, cause one hour of life is life, it's something.

So, he said, "Doña Maria, do not worry, when you wake up the headache is going to be gone." And I grabbed his hand and I held his hand and I kissed it and I told him, "May God bless you," and then I was knocked out again.

---

[6] An arachnoid cyst is a membrane-lined fluid sac, located between the lower brain and spinal cord region of the cranium. Stedman's Medical Dictionary 353 (5th ed. 1982).

[7] An official English translation of the informed consent form is included as an appendix to this opinion.

Q.      What was your understanding of what was the operation for?

A.      When he came he said, "Doña Maria" because he woke me up, because I was sleeping as I said before. He woke me up and he said, "I am doctor Rosado, I am the one [who is] going to operate on you, because this is a life or death situation." Those were the words he used.

He had already told my sister and everybody else, except me, because I was  sleeping. So, he woke me up and he told me that. And I said, "Just take this away, this is what's bothering me, I'm going to die, this is going to kill me," and he said, "Ok, sign here and I see you in the operating room." And I fell asleep again. I signed and I fell asleep again.

Q.      What was he going to operate?

A.      He said he was going to operate on the tumor. That if it wasn't extracted, I was going to die. That it was a life or death situation.

Q.      What tumor?

A.      The tumor on the head. He said, "That's what you are like that, that's why you fell like your eyes want to pop out" . . . And he said, "That's going to make you a lot better." And I said, "Thank you, yes, yes, please, then  operate."

Docket # 150-1, ¶ 20 (citing docket # 128-12, 18:10-19:19).[8] Finally, regarding Defendants'

contentions in connection with the informed consent form, plaintiffs state that Santana-

Concepcion speaks no English and argue that she did not understand what she signed,

because "the fourth line of the inform[ed] consent document [was] written in English; it

state[ed] arachnoid cyst, drainage, fenestration, and shunt." Docket # 128, ¶ 27.[9]

**Standard of Review**

Because the Court expounded the standard for summary judgment in its previous

Opinion, brief remarks about it suffice here. It is well settled that "the function of a motion

---

[8] The Court already concluded that Santana-Concepcion's surgery was undertaken for valid reasons and performed properly (Docket # 136); therefore, the Court need not consider the arguments plaintiffs present now on these points.

[9] Although plaintiffs' submissions this time around are silent about the informed consent form, the foregoing quote comes from previous entries of record.

for summary judgment is to smoke out if there is any case . . . and, if there is no case, to conserve judicial time and energy by avoiding an unnecessary trial and by providing a speedy and efficient summary disposition." Bland v. Norfolk & S.R. Co., 406 F.2d 863, 866 (4th Cir. 1969).  Accordingly, the summary judgment motion seeks to "isolate and dispose of factually unsupported claims or defenses [before trial]." Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The dispositive question for this inquiry is whether the nonmovant, who will bear the burden of proof at trial, has pointed to the existence of evidence that could support the necessary elements of her claim. Id. at 322-23. If she has not, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial," id., which, in turn, "allows the summary judgment engine to operate at full throttle." Maldonado-Denis v. Castillo Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994).

### Applicable Law And Analysis

The informed consent claim of the underage plaintiffs is premised on two well-settled principles of Puerto Rican tort law: (1) that "a person is entitled to compensation for the sufferings, emotional distress or mental anguish experienced as a consequence of the material or other damages caused directly to their relatives," Santino-Rivera v. Serv Air, Inc., 1994 P.R.- Eng. 909, 527, 137 P.R. Dec. 1, 10-12 (1994); and (2) that "a physician's failure to obtain the patient's informed consent for surgery gives rise to a cause of action . . . . separate and distinct from a cause of action for medical malpractice attributable to a diagnosis or treatment," Santiago-Otero v. Mendez, 1994 P.R. - Eng. 909, 224, 135 P.R. Dec. 540, 557 (1994).[10] Stated differently, the underage plaintiffs' claim to be entitled to relief because (1) Dr. Rosario failed to provide their mother with the information required under the informed consent doctrine; (2) their mother suffered damages due to Dr. Rosado's omission; and (3)

---

[10] The substantive law of Puerto Rico governs the outcome in this case. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).

they experienced emotional distress and anguish due to the damages their mother suffered. Docket # 71. Plaintiffs' contentions, however, are against the undisputed evidence of record and the applicable law.

The informed consent doctrine imposes upon medical practitioners the duty to inform "patients of the nature and risks of the proposed treatment so as to place the patient in a position to reach an intelligent and informed decision." Rodriguez-Crespo v. Hernandez, 21 P.R. Offic. Trans. 637, 121 P.R. Dec. 639, 664 (1988). Underlying this doctrine is the tenet that every person has the right "to self-determination, that is, to freely decide what can be done with his or her body . . . ." Sepulveda de Arrieta v. Barreto, 1994 P.R. -Eng. 908, 876, 137 P.R. Dec. 735, 742 (1994); accord Santiago-Otero, 1994 P.R. - Eng. 909, 224 n. 24 ("The informed consent doctrine is based on the fundamental right that consecrates the inviolability of the human body as an unalienable right of the human person."). Accordingly, a medical practitioner is duty-bound to "disclose the reasonably foreseeable risks involved, as well as the benefits of the treatment and invasive procedures to be performed on the human body, and the options available. He must also inform the patient of the probable risks involved if the condition goes untreated." Rodriguez-Crespo, 21 P.R. Offic. Trans. 637.

The informed consent doctrine is not of absolute application, however. Exceptions to the doctrine are allowed, for example, in emergency situations, "where obtaining the patient's consent results impractical because the patient's life or health is under a great threat that requires immediate medical attention." Montes v. State Insurance Fund, 87 P.R. Dec. 199, 204 (1963) (translation provided); see also Rodriguez-Crespo, 21 P.R. Offic. Trans. 637. The Puerto Rico Supreme Court has defined the term "emergency" in the context of the informed consent doctrine as "an unforeseen combination of circumstances which calls for immediate action," and thus, has rationalized the exception by noting that when such "emergency occurs there is an immediate necessity to cope with it." Torres-Perez v. Hospital Dr. Susoni, Inc., 95 P.R. Dec. 867, 473 (1968) (quoting Wheeler v. Barker, 208 P.2d 68, 73-74 (Cal. 1949).

In this case, the record remains inconclusive about whether Santana-Concepcion's surgery was "an immediate necessity." To be sure, the record does show, and the Court already determined, that Santana-Concepcion's condition was serious and that both Dr. Rosado's decision to operate on her as well as his performance at the operating table were proper. Santana-Concepcion, 2012 WL 1107663. Notwithstanding, these facts alone are insufficient in light of the two-day delay  between Dr. Rosado's decision to operate and the performance of the operation. Defendants' submission to the Court is silent in this regard. Accordingly, with no evidence of record to explain away the two-day delay, a genuine, material dispute precludes the summary application of the emergency exception to the informed consent doctrine.

Still, the underage plaintiffs' claim fails for another reason. To succeed under the informed consent doctrine, a plaintiff must prove that the damages underlying her complaint resulted from the practitioner's failure to provide requisite information. Sepulveda de Arrieta, 1994 P.R. -Eng. 908, 876.[11] This burden is satisfied with evidence showing that "in the normal course of events [the medical practitioner sued] had to foresee that the lack of pertinent information would lead [the] patient . . . to take a different decision than the one she would have taken if she had been suitably informed." Id., see also Soc. De Gananciales v. Geigel, 145 P.R. Dec. 663, 671 (1998). In other words, the dispositive inquiry is not whether the "**patient**—subjectively or objectively—would or would have not consented to the proposed medical treatment" had she been provided with the omitted information. Sepulveda

---

[11] A prerequisite to this casual connection requirement is a showing that the practitioner did in fact fail to provide pertinent information to the patient. Santiago-Otero, 1994 P.R. - Eng. 909, 224 n. 25. Here, other than stating that Santana-Concepcion signed an informed consent form, Defendants have proffered no evidence showing the extent of the parties' pre-surgery interactions. Without more, the Court is in no position to determine whether Dr. Rosado provided all requisite information to Santana-Concepcion. See Anaya-Burgos v. Lasalvia-Prisco, 607 F.3d 269, 272 (1st Cir. 2010) (vacating and remanding judgment for defendants even though an informed consent form had been signed). The Court therefore assumes without deciding that Dr. Rosado failed to do so.

8

de Arrieta, 1994 P.R. -Eng. 908, 876 (emphasis added). Rather, the Court must determine whether the **practitioner** had to "foresee that the lack of information would lead the patient to expose herself to the nondisclosed risks." Id. This determination is of course a factually-dependent, case-by-case one. Id.

In this case, the analysis begins with the undisputed fact that both Dr. Rosado and Santana-Concepcion believed the surgery to be a life-saving necessity. See Santana-Concepcion's deposition at Docket # 128-12, 18:12-15. Most people when presented with such a scenario would likely opt for surgery without much hesitation, especially if given a positive post-operating prognosis. In fact, the Court believes that the following remarks Santana-Concepcion made during her deposition accurately describe the reaction most people would have when deciding whether to accept a life-saving surgery: "Well, yes, of course I'm going to say yes, cause one hour of life is life, it's something." Docket # 128-12, 18:16-17. Therefore, to create a genuine issue of fact under the applicable foreseeability standard, plaintiffs needed to direct the Court to facts Dr. Rosado could have relied upon to foresee that Santana-Concepcion was likely to behave different than most people under the circumstances. Plaintiffs have provided no evidence whatsoever in this regard. To the contrary, the record shows that Santana-Concepcion unobjectionably, unequivocally, and repeatedly told Dr. Rosado to go ahead with the surgery. Docket # 150-1, ¶ 20 (citing Docket # 128-12, 18:10-19:19).

On top of this, the record also shows that Dr. Rosado informed Santana-Concepcion about her condition as well as about the surgery. Id. He explained the same to members of Santana-Conception's family present at the hospital before the surgery. Id. Further, Santana-Concepcion was alert and calm, and she appeared to understand her predicament as explained to her. The following excerpt from plaintiffs' opposition memorandum confirms this point: "When doctor Rosado discussed with her the need of a surgery, Ms. Santana stated 'Good, not a problem. Do as fit . . . .' Ms. Santana did not act alarm[ed], apprehensive, did not refuse

and did not evidence a psychological reaction." Docket # 150-1, p. 9.  Also telling in this regard is the fact that when informed about the surgery, Santana-Concepcion blessed and thanked Dr. Rosado; and immediately thereafter fell asleep soundly.  Docket # 128-12, 18:10-19:19. And while controversy exists concerning the extent of the pre-surgery interactions between the parties, the record shows that Santana-Concepcion was provided with (and she signed) an informed consent form disclosing many of the risks and benefits of the surgery. In sum, the record shows that Dr. Rosado faced the following pre-surgery scenario: (1) he had a patient in need of a life-saving surgery; (2) he had verbally informed the patient and her family about the surgery and they had reacted calmly and approvingly to the news; and (3) the patient had consented verbally and in writing to the surgery. The conclusion that Dr. Rosado could have foreseen a decision to forego surgery by Santana-Concepcion is inconceivable under these circumstances; therefore, summary judgment is appropriate. See Staelens v. Dobert, 318 F.3d 77, 79 (1st Cir. 2003) ("Although the question of proximate cause—i.e., whether a risk of harm was reasonable foreseeable—is ordinarily for the jury, summary judgment may be appropriate when the evidence and the reasonable inferences drawn therefrom lead to but  one conclusion.").

　　　As stated above, plaintiffs argue that Santana-Concepcion consented to the surgery and signed the informed consent form without understanding the English terms "arachnoid cyst, drainage, fenestration, and shunt." Docket # 128, ¶ 27.[12] Even if this were the case, the focus here is not Sananta-Concepcion but Dr. Rosado. See  Sepulveda de Arrieta, 1994 P.R. -Eng. 908, 876. From his point of view, the informed consent form, which was written in Spanish (but for the four terms Plaintiffs cling upon) and provided information about risks and benefits of the surgery, together with the other undisputed facts of record,  provided

---

[12] The Court notes, without weighing, that Santana-Concepcion was a registered nurse by trade and that she received treatment in the United States for her arachnoid cyst before the surgery. In a trial, both of these facts would undoubtedly have to be reconciled with the proposition that Santana-Concepcion did not understand what the four terms just quoted meant.

_____

ample grounds to plunge ahead with the surgery without more. At any rate, considering the undisputed evidence of record, the contention that it was foreseeable to Dr. Rosado that Santana-Concepcion would reject a life-saving surgery if provided with Spanish translations of the terms "arachnoid cyst, drainage, fenestration, and shunt" is, to say the least, nonsensical.

**Conclusion**

For the foregoing reasons, Defendants' summary judgment motion is **GRANTED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 1st day of August, 2012.

*s/Salvador E. Casellas*
SALVADOR E. CASELLAS
U.S. Senior District Judge